Adela T. **BAILOR** and Darryl Bailor, Plaintiffs,

v.

**SALVATION ARMY, Prison Fellowship Ministries, Ken Jackson, and United States of America, Defendants.**

No. 1:93–CV–121.

United States District Court, N.D. Indiana, Fort Wayne Division.

June 10, 1994.

Robert O. Vegeler, Beers Mallers Backs and Salin, Fort Wayne, IN, Timothy J. Kennedy, Miller Muller Mendelson and Kennedy, Indianapolis, IN, for plaintiffs.

Carolyn Spengler, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, for defendant, Prison Fellowship Ministries and Ken Jackson.

John Wilks, Wilks and Kimbrough, Fort Wayne, IN, for defendant, Salvation Army.

Deborah M. Leonard, U.S. Attys. Office, Fort Wayne, IN, for U.S.

## *MEMORANDUM OF DECISION AND ORDER*

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on a series of motions filed by each of the Defen-

dants and this Memorandum of Decision and Order will address each.

Defendants, Prison Fellowship Ministries, ("PFM") and Ken Jackson, ("Jackson") filed a Motion For Summary Judgment on November 18, 1993. Plaintiffs, Adela Bailor ("Bailor") and Darryl Bailor filed a response on January 25, 1994. PFM and Jackson filed a reply brief on February 8, 1994.

On December 23, 1993, the Defendant, Salvation Army, filed a motion for summary judgment. Plaintiffs' response was filed on February 8, 1994. The Salvation Army's reply was filed on March 1, 1994.

On January 21, 1994, the United States filed a motion to dismiss for lack of subject matter jurisdiction and improper venue. Plaintiff's filed a response on March 4, 1994, and the United States filed a reply on April 4, 1994. Plaintiffs filed a sur-reply on May 19, 1994.

For the reasons stated below, all of the foregoing motions will be GRANTED. The respective requests for oral argument are DENIED because they do not comply with N.D.Ind.L.R. 7.5(a), and because oral argument would not be helpful in any event.

### II. FACTUAL AND PROCEDURAL HISTORY[2]

This suit arises out the brutal rape and beating of Adela T. Bailor ("Bailor") by William T. Holly ("Holly") on May 9, 1991. While the Court will ultimately proceed to a discussion of the facts, an initial identification of the parties is necessary.

### A. THE PARTIES

At the time of the attack Bailor was an administrative assistant at PFM's Fort Wayne office having recently commenced her employment there in February, 1991. She, and her husband, Plaintiff Darryl Bailor,

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. The Court has crafted one set of facts to adjudicate all three motions and has construed all evidence in a light most favorable to the plaintiff, as required on summary judgment. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Notably, however, on the whole, these defendants do not appear to dispute the general factual allegations contained in the complaint, only their legal import.

were then residents of Fort Wayne, but by the time of the filing of the complaint they had relocated to Colorado Springs, Colorado.[3] (Plaintiff's Amended Complaint, ¶ 5).

Defendant, the Salvation Army is a not-for-profit, Illinois corporation, with its principal place of business in Chicago, Illinois. The Salvation Army operates a Chicago residential facility or "halfway house" for criminal offenders ("Salvation Army Facility"). Pursuant to a contract with the Federal Bureau of Prisons ("the BOP"), the Salvation Army Facility houses federal offenders. The performance of this contract, indeed all private halfway house contracts, is governed by a "Statement of Work" ("SOW") promulgated by the BOP.[4]

PFM is a Washington, D.C. corporation with its principal place of business located in the District of Columbia. PFM provides services and assistance to prison inmates and other criminal offenders at various locations throughout the United States and maintains an office in Fort Wayne, Indiana.

In 1991, Jackson was the Indiana State Director of PFM and worked out of the Fort Wayne Office. He is currently a PFM regional director.

The BOP is the United States federal agency charged with the management and regulation of all federal penal and correctional institutions; it also has safekeeping, care and subsistence responsibilities for those incarcerated persons charged with, or convicted of offenses against the United States. 28 C.F.R. § 0.95 (July 1, 1993). The BOP maintains a secure facility for housing federal inmates in Chicago, Illinois known as the Metropolitan Correctional Center ("MCC").

Holly is not a party to this action. Rather, he was a federal inmate at the MCC in the custody of the United States Attorney General and the BOP. In 1991 he transferred from the MCC to the Salvation Army Facili-

ty from which he later escaped, just a few days prior to the attack on Bailor.

### B. FACTS [5]

Bailor's tragic story starts on August 26, 1975, when Holly, and two other men, committed an armed bank robbery in South Carolina. Holly and one of his co-defendants apparently vaulted over the cashier's counter, grabbed the money and fled. (U.S. reply bf. exhibit F, Unit Team CCC placement recom.). During the course of the robbery they were armed and threatened the lives of the bank employees. *Id.*

Holly was ultimately convicted on bank robbery in the District of South Carolina, and on February 2, 1976 he was sentenced to eighteen years. (Dupont Declaration, p. 2 ¶ 3). He was placed at the U.S. Penitentiary in Terre Haute, Indiana so that he could receive drug treatment. (U.S. reply bf. exhibit 9, pre-sentence report).

As with so many others, this was not Holly's first brush with the law, as he had frequently been in the State of Virginia's criminal justice system. Beginning in 1969 and into the mid 1970's, Holly was twice convicted of possession of heroin, once convicted of breaking and entering, and once convicted of forgery and uttering. (U.S. reply bf. exhibit 9, pre-sentence report). In fact, Holly was on parole from this last conviction when he committed the bank robbery. *Id.*

Holly's juvenile record discloses that he was charged with assault for threatening his mother with a razor blade (later dismissed); larceny (for which he received a suspended sentence); and possession of a concealed weapon (also dismissed). *Id.* Holly was also the recipient of psychiatric care as a youth. When he was 14 years of age (1961) the Richmond Juvenile Court described Holly as being in "state of anxiety and extreme tension" due to his "awareness to [sic] very hostile almost sadistic impulses." *Id.* His condition was later described by the Virginia

---

**3.** Except as to the claims against the United States, the diversity of citizenship between the Plaintiffs and PFM and Jackson is the basis for this court's jurisdiction 28 U.S.C. § 1332. Subject matter jurisdiction over the claim against the United States is contested and will be resolved, *infra.*

**4.** As discussed at fn. 15, *infra,* there are at least two versions of the SOW.

**5.** Additional facts will be provided when necessary in Section IV of this opinion.

Medical College as a "nervous brain." At 15 years old (1962) he was diagnosed by a Virginia state hospital as having a "transient situational personality disorder and adjustment reaction of [sic] adolescence." *Id.*

Holly's adult record also discloses several arrests prior to 1969, including: threatening his mother; public intoxication; two charges of battery against his wife; a charge of rape which resulted in a 6 month surety for night prowling; forging prescriptions; writing bad checks and vagrancy. (*Id.* and FBI record information)

Following serving his sentence for bank robbery, Holly was released on federal parole in 1982 in the state of Virginia. Holly violated that parole in 1983, and in 1985 his parole was revoked and he was returned to the federal penitentiary at Terre Haute. While the underlying facts of the parole violation are not revealed in the record, Holly was apparently initially charged with attempted robbery, brandishing a pistol and carrying a concealed weapon. *Id.* However, as part of an apparent plea agreement, the brandishing charge was dropped and the attempted robbery charge was reduced to petty larceny. *Id.*

In October of 1988, Holly was released from the Terre Haute prison and placed into a work release program in Fort Wayne, Indiana. Just prior to this placement, the prison chaplain contacted Jackson at PFM's Fort Wayne office to inform him that Holly would soon be in the work release program. (Jackson dep., p. 15). The Chaplain thought that Holly would be eligible for PFM assistance while in Fort Wayne. *Id.*

The decision whether to provide services to Holly was entirely within Jackson's discretion. (*Id.* at 24; Roberts Dep., p. 33). In making that determination, Jackson considered the nature of Holly's crime, whether he held genuine religious convictions, and whether there was any known violence in his background. (Jackson Dep., p. 22–24). Jackson did not conduct an independent inquiry to obtain this information; rather, he relied solely on the information provided to him by the prison chaplain. (Jackson dep. p. 18–19). Jackson made no inquiry of Holly about his prior convictions or criminal history. *Id.*

Based on the information provided, Jackson accepted Holly as a client of PFM and Holly soon began receiving assistance. (*Id.* at 27). With Jackson's help, Holly soon moved out of the work release center and into his own apartment. Jackson also helped Holly find furniture, a car, and a job in the same building as PFM's offices. (*Id.* at 31, 65). In addition, PFM often provided Holly with financial assistance.

During his stay in Fort Wayne, Holly routinely made unannounced visits to PFM's offices—as often as two or three times per week. (*Id.* at 28). During those visits he would frequently make unwelcome and inappropriately flirtatious comments, or gestures, towards Sara Roberts ("Roberts"), an employee at PFM. (Roberts dep., p. 20–26). Roberts complained to Jackson and David Clendenen ("Clendenen"), another PFM employee, but nothing was ever done. *Id.* In fact, there were no rules which prohibited offenders from coming to PFM's offices unannounced; nor were any security measures employed which prevented offenders from entering the offices or interacting with the staff. *Id.*

In December of 1988, just a few months after his placement in Fort Wayne, Holly violated the conditions of his release when he left his Fort Wayne apartment and went to Indianapolis for a weekend. (U.S. reply bf. exhibit 9, pre-sentence report). According to Holly's self-report, he went on a "drug binge," passed out, and woke up in Indianapolis. *Id.* He then apparently called Jackson seeking a return to Fort Wayne. (Roberts' dep., p. 53–4). Before that could be accomplished, however, the Federal Marshals were notified and Holly was arrested on December 12, 1988, on an escape charge. (Dupont Declaration, p. 3).

Holly then remained in custody until March 16, 1990 when he received a sentence of 24 months for escape. *Id.* The BOP sent him to the MCC. During his incarceration Holly continued to correspond with Roberts, and Vicky Ash, another PFM employee. The correspondence (both by letter and phone) was largely romantic in nature.

(Roberts dep., p. 43; Ash dep., p. 17–20). Moreover, Holly apparently told them that he intended to return to Fort Wayne and receive additional PFM services after his release. *Id.*

After some time at the MCC, Holly completed an application to be transferred to a community corrections center ("CCC").[6] A CCC is a halfway house where federal (and frequently, state) inmates, approaching their release date, can finish out the last six months of their sentence. The facility is designed to provide pre-release programs so offenders have an easier transition from prison to society. The criteria for transfer into a CCC is governed by administrative regulations, called "program statements," promulgated by the BOP.

Holly's application was first reviewed by a BOP unit team charged with making initial transfer determinations. On December 8, 1990, the unit team recommended that Holly be transferred to the Salvation Army facility. (U.S. reply bf., exhibit F, CTC referral form). This referral was reviewed by Dennis Silverberg, ("Silverberg"), the associate (and then-acting) Warden of the MCC.[7] (Silverberg Declaration, ¶ 3). Silverberg received Holly's application which was accompanied by the unit team's referral memorandum. The unit team's only expressed concern over Holly's placement was his prior conviction for bank robbery. Also attached was Holly's file, which included his sentence monitoring reports, progress reports, FBI record sheet, and the U.S. probation department's presentence report prepared in connection with Holly's escape charge. (U.S. reply bf., exhibit F; Silverberg declaration, ¶ 3). Silverberg reviewed the referral application and accompanying documents, and then conferred with the unit team. He then learned that Warden Henry had already discussed Holly's placement with them, had personally reviewed all the records, and had expressed his intent to approve the transfer. (Silverberg declaration, ¶ 3). Based on all of the foregoing information Silverberg initially approved the unit memorandum and referral. *Id.*

The entire referral packet was then forwarded to the Salvation Army Facility for its review. The packet was reviewed by Paul Hall, the primary intake officer. (Rowland dep., p. 6, Hall dep., p. 5). The Salvation Army may reject an inmate transfer made by the BOP. (Rowland dep., p. 21, Hall dep., p. 16). However, any decision to reject an inmate must be based on present information pertaining to institutional adjustment. (Hall dep., p. 16). If the Salvation Army Facility rejects a proposed transfer, Hall must write a letter establishing that the person is not an acceptable risk based on institutional information. *Id.* As a result, rejections are rare. (*Id.* at 17). In fact, the only rejected individuals are those with a history of "excessive violence," (Rowland dep., p. 22), child molesters, rapists, or arsonists with psychological problems. (Hall dep., p. 16–7).

With regard to Holly, Hall does not specifically recall his review, except that the 1966 rape charge listed on Holly's record may have been a cause for concern. (Hall dep., p. 19–24). He remembers only that he requested additional information from the BOP, but that none was available. *Id.* Other than the rape charge, Holly's history was deemed unremarkable. *Id.* Hall found Holly acceptable and approved his transfer. *Id.*

Ultimately, final approval for the transfer was given by Henry in a January 17, 1991, transfer order. (U.S. reply bf., exhibit F, furlough application and approval record). On January 21, 1991, Holly was transferred to the Salvation Army Facility. (Dupont Declaration, ¶ 10). Since Holly was placed for the six (6) month maximum, his projected release date with good time credits was June 8, 1991.

Generally, as a CCC resident, Holly was free to come and go as he pleased so long as he signed in and out. However, he had to be

---

6. In contrast to a "CCC," a "CTC" stands for Community Treatment Center. A CTC and a CCC are the same thing and the terms are frequently used interchangeably. For the sake of consistency, the Court will ordinarily refer to such facilities as a CCC, except when referring to a document, regulation or statute that specifically uses the term CTC.

7. Silverberg acted as MCC warden whenever Warden Mark Henry ("Henry") was temporarily away.

employed, was to return to the facility by 11:00 p.m. each night, and he was to participate in various counseling programs. He was also required to submit to mandatory, random drug-testing at least four times a month. (SOW. ch. 6, p. 27). Pursuant to this mandate, Holly provided a urine sample on April 21, 1991. (Rowland dep., p. 68). On May 6, 1991, David Brantford ("Brantford") Holly's resident advisor at the Salvation Army Facility, received a lab report showing that Holly's sample tested positive for cocaine.

Once notified of such a violation, Brantford and Hall had two options. On the one hand, they could draft an incident report, serve Holly with a copy, and proceed to a disciplinary hearing. (SOW p. 32). In such a case, Holly would remain at the facility until final resolution of the disciplinary proceedings. *Id.* On the other hand, if they believed Holly presented a risk of harm to himself or other residents, or was a potential escapee, they could contact the U.S. Marshal directly and seek to have Holly detained before any notice or hearing. *Id.*

Brantford and Hall determined that immediate detention of Holly was unnecessary. (Brantford, dep. p. 25–28; Hall dep. p. 31). So, at 2:00 on May 6, 1991, Brantford drafted an incident report. (Incident report; Rowland Dep., p. 76). Hall reviewed the report and placed it in a basket to be served upon Holly. When Holly returned from work that evening, Carolyn Townsend, an employee, served notice of the disciplinary violation on him. (Townsend dep., p. 16). Approximately eight minutes later, Holly appeared at the door to the Salvation Army Facility with his luggage. (Garrett dep., p. 27). When the shift manager at the front desk asked where he was going, Holly replied "I'm out of here. I'm not going back to no MCC." *Id.* As Holly was leaving, the shift manager briefly informed him of the consequences of his action, but he left anyway. *Id.*

The BOP was immediately notified of Holly's escape. (Rowland Aff., p. 6–7, ¶ 22 and Exh. H). That notice was received by Denise Hilliard, the Community Corrections Manager ("CCM") (the BOP employee that serves as liaison to the Salvation Army Facility), who in turn notified the Federal Marshal's for the Northern District of Illinois of Holly's escape the next morning. (Wilson Declaration, # 2, ¶ 2). At about the same time, she also sent an electronic mail notice to the BOP's North Central Regional Director, Calvin Edwards. (Wilson Declaration, # 2, ¶ 3). The e-mail message was also routed to several other individuals within the BOP's administration. (Wilson Declaration, # 2, ¶¶ 10, 11).

Two days after his escape, on May 8, 1991, Holly called Jackson at home and informed him that he had been released, would be in Fort Wayne the following day, and would like PFM's assistance. (Jackson dep. pp. 48–9). Jackson told Holly to call him at home when he got into town. (*Id.* at p. 49–52). Jackson never verified Holly's claimed "release." *Id.*

On the morning of May 9, 1991, Jackson came into PFM's offices, picked up some papers and left for a meeting in Indianapolis. (Bailor dep., p. 19; Bailor Affidavit, ¶ 7). Bailor had already arrived at the office and Jackson told her he would return later in the afternoon, but made no mention of his contact with Holly. (Bailor dep., p. 87 Bailor Affidavit, ¶¶ 6, 7). Later that morning, Holly called PFM seeking assistance. (Bailor dep., p. 18, 21). He spoke with Bailor, who told him that Jackson was not there, but that he would be back later in the afternoon. (*Id.* at 22). She suggested that Holly go to a local rescue mission and church for food and shelter. (*Id.* at 23). Apparently unhappy with these options, Holly became hostile over the phone. (*Id.* at 25).

Later that morning, Holly called PFM again. (*Id.* at 24–25) Once more he became angry and hostile. *Id.* At that point, Bailor turned the phone over to Clendenen, who provided Holly with the same information Bailor had. (*Id.* at 26). Clendenen then left for Indianapolis to join Jackson. *Id.* This left Bailor alone in the office.

Later in the afternoon, Bailor, still alone, received a phone call from the rescue mission. (*Id.* at 29). A woman informed Bailor that Holly was at the Mission demanding money and a bus ticket and that PFM had promised him both, but had failed to provide

either. Holly was apparently now soliciting the same things from the Rescue Mission. (*Id.* at 29). Bailor told the woman that Jackson was gone and would not be back until later that afternoon. The caller told Bailor she would see what she could do to help Holly. (*Id.* at 30).

Then, sometime later, Holly arrived at PFM's offices. He told Bailor that Jackson had told him the night before that he could stop by and pick up cash and a bus ticket. (Bailor Affidavit, ¶ 9). Bailor reiterated that Jackson would not be returning to the office for several hours and invited him to wait in the lobby. (Bailor dep., pp. 34–39). Holly waited for approximately 45 minutes but became increasingly agitated and hostile. *Id.* Finally, Holly locked the office door and brutally raped and beat Bailor. (*Id.* at 36–39). *Id.*

### C. PROCEDURAL HISTORY

On May 6, 1993, Bailor and her husband filed a complaint for common law negligence against the Salvation Army. Bailor also alleged that PFM and Jackson had committed a common law intentional tort and that she also had a claim pursuant to 42 U.S.C. 1983.[8] Later, on November 24, 1993, Bailor filed her First Amended Complaint, which added a claim against the United States as an indispensable party (for the actions of the BOP) pursuant to the Federal Tort Claims Act. 28 U.S.C. 2671 *et seq.* and Fed.R.Civ.P. 19.

Defendants, PFM, Jackson, and the Salvation Army have all filed motions for summary judgment as to each of Bailor's claims. The United States has moved for dismissal of all claims against the government for lack of subject matter jurisdiction and improper venue. All of these motions will be addressed seriatim, however, a review of summary judgment principles is first required.

### III. STANDARD OF REVIEW ON SUMMARY JUDGMENT

 Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

 Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. at

---

**8.** Bailor now concedes that her claim brought pursuant to 42 U.S.C. § 1983 (Count III) has no viability and summary judgment will therefore be granted accordingly.

2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

■■■ Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. FED.R.CIV.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

9. The Plaintiff as well as PFM and Jackson apparently concede that Indiana law applies to this question and the Court agrees. *See Hubbard*

## IV. DISCUSSION

### A. *PFM and Jackson*

Count II of Bailor's complaint alleges that PFM and Jackson are liable because they committed an intentional tort. PFM and Jackson have moved for summary judgment on this common law claim by arguing that it is barred by the exclusivity provision of Indiana's Worker's Compensation Act.[9] In order to address this issue, the Court will discuss PFM and Jackson separately.

### 1. *PFM*

■■■ PFM argues that Bailor's common law tort action is barred by the exclusivity provision of the Indiana Worker's Compensation Act, I.C. 22–3–2–6 *et. seq.*, which provides:

> The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies available under IC 16–7–3.6.

I.C. 22–3–2–6. This provision has been construed as

> excluding all rights and remedies of an employee against his employer for personal injury or death if the following three statutory jurisdictional prerequisites are met:
>
> A. Personal injury or death by accident.
>
> B. Personal injury or death arising out of employment.
>
> C. Personal injury or death arising in the course of employment.

*Evans v. Yankeetown Dock Corp.* 491 N.E.2d 969, 973 (Ind.1986); *see also, Gordon v. Chrysler Motor Corp.*, 585 N.E.2d 1362, 1363 (Ind.App.1992); *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 683 (Ind.App.1991); *Arrow Uniform Rental, Inc. v. Suter*, 545 N.E.2d 832, 833 (Ind.App.1989). As will be seen, from the Court's perspective, Bailor falls within all three prerequisites and is thus foreclosed from pursuing a common law remedy against her former employer.

*Manufacturing Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987).

■ Under Indiana law, personal injury occurs "by accident" for purposes of the Worker's Compensation Act when the sufferer does not intend, or expect that an injury will result from what he or she was doing. *Evans,* 491 N.E.2d at 974 (quoting *Inland Steel Co. v. Almodovar,* 172 Ind.App. 556, 361 N.E.2d 181, 187 (1977); *Gordon,* 585 N.E.2d at 1364; *Arrow Uniform Rental,* 545 N.E.2d at 833. Clearly, on May 9, 1991, Bailor never expected, as she arrived or remained at work, that she would be brutally raped and beaten by Holly or anyone else. Thus, Bailor's injuries were "by accident."

Bailor's injuries also arose out of her employment.

An accident arises out of employment when there exists some causal nexus between the injury complained of and the duties or services performed by the injured employee. A causal relationship is established when the accident arises out of a risk which a reasonably prudent person might comprehend as incidental to the employment at that time of entering into it, or, when the facts show an incidental connection between the conditions under which the employee works and the injury.

*Fields v. Cummins Emp. Fed. Credit Union,* 540 N.E.2d 631, 635 (Ind.App.1989); *see also, Gordon,* 585 N.E.2d at 1365; *Arrow Uniform Rental,* 545 N.E.2d at 833. PFM's sole purpose was to provide services for individuals who had been released from prison. Thus, a large part of Bailor's responsibilities focused on dealing directly with ex-convicts, including some with obviously dangerous propensities. A reasonably prudent person could thus easily recognize the incidental risk of attack by, or confrontation with, the volatile clients who frequented PFM. In fact, Holly had been a recipient of PFM services in the past, and on the afternoon of the attack was there for more. Up until the attack, Bailor had dealt with Holly solely in her capacity as an employee of PFM, and as Jackson's assistant. Thus, Bailor's contacts with Holly were clearly employment related. These "facts show an incidental connection between the conditions under which [Bailor] work[ed] and the injury," she suffered. *Fields,* 540 N.E.2d at 635. Therefore, Holly's attack "arose out of"

Bailor's employment as a matter of law. *See generally, Evans,* 491 N.E.2d at 975 (Assault by insane co-employee arose out of plaintiff's employment); *Nelson v. Denkins,* 598 N.E.2d 558, 561 (Ind.App.1992) (Assault by supervisor arose out plaintiff's employment); *Fields,* 540 N.E.2d at 635 (Sexual harassment by co-worker arose out of plaintiff's employment).

Finally, Bailor's injuries arose during the course of her employment. "An injury occurs 'in the course' of employment if the time, place and circumstances indicate that it was suffered while the employee was furthering the ends of the employer." *Crowe v. Blum,* 9 F.3d 32, 34 (7th Cir.1993); *see also, Arrow Uniform Rental,* 545 N.E.2d at 833. The attack on Bailor occurred during regular work hours, on the work premises, and while she was assisting a client. As a result, her injuries occurred "in the course" of her employment. *Crowe,* 9 F.3d at 34; *Arrow Uniform Rental,* 545 N.E.2d at 833. Therefore, having met all the jurisdictional requirements, Bailor's exclusive remedy under Indiana law was pursuant to the Worker's Compensation Act.

■ Bailor contends, however, that she is free to seek common law damages because her employer intentionally injured her—a recognized exception to the exclusivity doctrine. But, while Indiana has adopted this exception, it has also applied a stringent, specific intent standard to it. *National Can Corp. v. Jovanovich,* 503 N.E.2d 1224, 1233 & n. 14 (Ind.App.1987). Under that standard, the employee as proponent of the exception, has the burden to show that the employer had an actual intent to cause the complained of harm. *Id; Gordon,* 585 N.E.2d 1362.

In order to meet her burden, Bailor claims that PFM "created a working environment . . . in which she was substantially certain to incur the physical attack by Holly." (Pl. bf. in oppos. to sum. judg., p. 18). In support of this theory Bailor points to several specific facts:

1) [PFM] and Jackson were not concerned about the criminal backgrounds and violent tendencies of the criminals who came to the [PFM] office, including Holly.

2) Jackson was not concerned that there were absolutely no safety procedures for the staff of the [PFM] office.

3) Jackson knew that Holly had expressed a romantic interest and displayed suggestive behavior toward Roberts.

4) Jackson knew that Holly had left his parole without permission, that Holly was a drug abuser, and that Holly had expressed a desire to return to Fort Wayne for help from [PFM].

5) Jackson knew that after Holly was apprehended [in 1988] he had threatened Roberts and had, once again, expressed a desire to return to the [PFM] office.

6) Jackson knew that Holly was coming to the Fort Wayne [PFM] office on May 9, 1991 for assistance.

7) Jackson knew that [Bailor] would be alone in the [PFM] office, but he did not tell [Bailor] about Holly.

(Plaintiff's memo. in opp. to summ. judg., p. 19–20). Bailor contends that the aforementioned acts or omissions show a substantial certainty on the part of PFM that Bailor would be attacked by Holly.

 At the very most, these allegations support an inference of reckless or wanton behavior by Bailor's employer, but they reveal no course of action taken with the specific intent to cause Holly's attack, or with any substantial certainty that an attack would occur.[10] *Blade v. Anaconda Aluminum Co., Inc.*, 452 N.E.2d 1036, 1038 (Ind. App.1983).

The *Blade* case is instructive. There, the Plaintiff was killed in a furnace explosion while working at Defendant's factory. *Id.* at 1037. Plaintiff (in an effort to side-step the exclusivity provision of Indiana's Worker's Compensation Act) alleged that the explosion and death resulted from the employer's intentional conduct because it had created the dangerous condition knowing with substantial certainty that an explosion and death would

occur. *Id.* In support of that claim, the plaintiff alleged that the employer intentionally disconnected several safety measures, refused to shut down what had become a malfunctioning and dangerous furnace, neglected to replace broken parts (opting instead for makeshift repairs) and then ordered that the furnace run in an improper and dangerous manner. *Id.* The trial court dismissed the case for failure to state a claim and the Appellate Court affirmed, reasoning: "[a]lthough we may infer from Blade's complaint that [the employer] intentionally pursued a course of conduct which jeopardized its worker's safety, no facts were alleged which support an inference that [the employer] intentionally injured Mr. Blade." *Id.* at 1038.

As the court observed:

> The mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classed as an intentional wrong. In such cases the distinction between intent and negligence is obviously a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a certainty.

*Id.* (quoting Prosser, The Law of Torts, p. 32 (4th ed. 1971)); *see also, National Can,* 503 N.E.2d at 1233.

As in *Blade,* the facts presented in this case could lead to an inference that PFM knew and appreciated the potential risk of a criminal assault on one of its employees, but there is no suggestion that PFM intended that Bailor be attacked by Holly, or that its appreciation of that risk rose to any degree of certitude. Therefore, Bailor cannot avail

---

**10.** The allegations made by Plaintiff refer only to the conduct of Jackson. However, for purposes of PFM's liability, it is not enough to show intentional conduct by Jackson. Plaintiff must also show that Jackson acted as the PFM's alter ego, or upon PFM's direct order. *Gordon v. Chrysler Motor Corp.*, 585 N.E.2d 1362, 1365 (Ind.App.

1992); *National Can,* 503 N.E.2d at 1233 & n. 13. No such showing has been made. Nevertheless, as will be seen, the allegations do not establish intentional conduct by Jackson either, and therefore, it becomes unnecessary to determine whether he was acting as PFM's alter ego, or at its direction.

herself of this exception to Indiana's Worker's Compensation Act.

■ Moreover, even if Bailor had raised a genuine issue of material fact regarding the intentional conduct of her employer, her present common law action would still be barred because she has already received considerable payments under Worker's Compensation. (Bailor dep., p. 59–61; Aff. of Deborah McDowell). That is, to the extent Bailor had the option of suing for tort damages, or filing for worker's compensation, or both, she still can collect only one remedy. *Lackey v. Duhadway Co., Inc.* 560 N.E.2d 671, 673 (Ind.App.1990) (citing *Lewis v. Lockard,* 498 N.E.2d 1024). Once Bailor collected her worker's compensation payments she relinquished her option to collect tort damages against any party liable for her worker's compensation award. *Id.* Accordingly, summary judgment must be granted on Bailor's claim against PFM.

### 2. Jackson

Bailor argues that even if her action against PFM is barred she may still maintain her action against Jackson, who allegedly is not protected under the statute. This, however misconstrues the law. IC 22–3–2–13 provides:

> Whenever an injury or death, for which compensation is payable under chapters 2 thorough 6 of this article shall have been sustained under circumstances creating in *some other person than the employer and not in the same employ* a legal liability to pay damages in respect thereto, the injured employee, or his dependents, in the case of death, may commence legal proceedings against the other person to recover damages notwithstanding the employer's or the employer's compensation insurance carrier's payment of or liability to pay compensation under chapters 2 through 6 of this article.

*Id.* (emphasis added). The language "not in the same employ" has come to mean that the protection of the exclusivity provision of the Worker's Compensation Act extends to co-workers. "This is not to say that co-workers are, by virtue of the Worker's Compensation Act, necessarily immune from suit in all instances." *Crowe v. Blum,* 9 F.3d 32, 35 (7th Cir.1993). Indeed, the phrase has been read as requiring more than simply having a common employer. *Thiellen v. Graves,* 530 N.E.2d 765, 767 (Ind.App.1988). [A] co-employee is immune under the 'same employ' language if the co-employee is acting in the course of his employment at the time of the employee's injury.... and the act causing the injury ... arise[s] out of the co-employee's employment. *Id.* Conduct arises out of employment where the co-employee acts for the benefit of the employer. *Fields .v. Cummins Emp. Fed. Credit Union,* 540 N.E.2d 631, 638 (Ind.App.1989).

■ The allegations made against Jackson are premised upon the manner in which he addressed employee concerns regarding office safety, and in the way he handled PFM's assistance to Holly, especially on the day of the attack. Thus, what Bailor is essentially charging is that Jackson failed to adequately perform his job duties. Indeed, it is only through Jackson's position at PFM that he had any obligation to perform the acts about which Bailor complains.

Bailor's argument suffers from a fatal incongruity. She cannot claim that Jackson, as a result of his position at PFM, had an employment duty to provide her with a safe place to work, yet at the same time argue that any failure to do so was outside his employment for purposes of Worker's Compensation. *See generally, Evans,* 491 N.E.2d at 975. To the contrary, the alleged acts or omissions of Jackson were clearly work related and arose out of his employment as a matter of law.[11] Accordingly, Jackson is immune from common-law liability by virtue of Indiana's Worker's Compensation Act.[12]

---

11. Jackson could also be liable if he acted with a specific intent to injure Bailor. *Perry v. Stitzer Buick,* 604 N.E.2d 613, 618 (Ind.App.1992). However, as discussed *supra,* 854 F.Supp. at pp. 1354–1355 plaintiff has failed to present any evidence that such an intent was present.

12. Bailor also filed a motion to strike portions of PFM's brief that it offered in support of its motion for summary judgment. Specifically, plaintiff seeks to strike her own deposition testimony wherein she testified that she did not personally believe that PFM or Jackson intentionally wanted

### 3. *The Loss of Consortium Claim*

 Darryl Bailor has filed a loss of consortium claim against both PFM and Jackson.

> A claim of loss of consortium is derivative in nature.... [It] derives it viability from the validity of the claim of the injured spouse.... Where ... the claim of the injured spouse against the alleged tortfeasor has been abrogated by statute, the right of the other spouse to recover for loss of consortium cannot exist.

*Nelson v. Denkins,* 598 N.E.2d 558 (Ind.App. 1992) (quoting *Arthur v. Arthur,* 156 Ind. App. 405, 296 N.E.2d 912, 913 (1973)). Since Bailor's claims against PFM and Jackson have failed, Darryl Bailor's derivative loss of consortium claim also fails. Therefore, summary judgment must be granted to PFM and Jackson on Darryl Bailor's loss of consortium claim.

### B. *The Salvation Army*

The Plaintiff has brought a common law negligence claim against the Salvation Army in Count I of her amended complaint by alleging the following:

a. The Salvation Army negligently failed to adequately assess the appropriateness of William Holly's placement at the Salvation Army facility;

b. The Salvation Army negligently failed to adequately monitor, supervise and restrict Holly's activities, such that he escaped from the Salvation Army facility;

c. After learning that Holly had failed a drug test, the Salvation Army negligently failed to call BOP or the United States Marshal to detain Holly before notifying Holly of the drug test disciplinary violation;

d. The Salvation Army negligently failed to take reasonable steps to locate and return Holly to the Salvation Army's facility once Holly had escaped;

e. The Salvation Army negligently failed to notify appropriate individuals and/or law enforcement agencies of Holly's escape from the Salvation Army's facility;

f. The Salvation Army negligently committed other acts and omissions which proximately resulted in Holly's escape from the Salvation Army's facility and his subsequent attack on [Bailor].

In short, the current motion before the Court focuses on the Plaintiff's contention that a private halfway house has a duty to a third person injured by an escaped convict if the halfway house has failed to exercise reasonable care in accepting or controlling a prisoner it has accepted into its program. *See* Defendant's Memorandum in Opposition, p. 3.

However, the Salvation Army's motion for summary judgment simply argues that they owed no duty to the Plaintiff under Indiana law, or that even if they did, neither the harm which occurred, nor its victim, were reasonably foreseeable; meaning that any breach of duty by the Salvation Army was not the proximate cause of the Plaintiff's injury.[13]

To premise a recovery on a theory of negligence, a plaintiff must establish three elements: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991) (citing *Miller v. Griesel,* 261 Ind. 604, 308 N.E.2d 701, 706 (1974)). Under Indiana law, the existence of a duty is a question of law. *Sports, Inc. v.*

---

to harm her. Plaintiff takes the position that this statement is the legal opinion of a lay witness and would therefore be inadmissible under Federal Rule of Evidence 701. While this may be true, given the Court's ruling, *supra,* it is unnecessary to consider Bailor's statements and, accordingly, Plaintiff's motion to strike has been rendered moot.

**13.** The Plaintiffs and the Salvation Army apparently concede that Indiana law applies to these questions and the court agrees. *See Hubbard Manufacturing Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987).

*Gilbert,* 431 N.E.2d 534 (Ind.App.1982) (citing *Neal v. Home Builders, Inc.,* 232 Ind. 160, 111 N.E.2d 280 (1953)). In *Webb,* the Indiana Supreme Court identified three factors which must be considered and balanced in order to impose a duty: " '(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns.' " *Fawley v. Martin's Super Market, Inc.,* 618 N.E.2d 10 (Ind.App.1993) (citing *Webb,* 575 N.E.2d at 997–8). *See also,* J. TIDMARSH, TORT LAW: THE LANGUAGES OF DUTY, 25 Ind.L.Rev. 1419, 1424, *et seq.* (1992). These duty factors will each be discussed in turn.

### 1. Relationship between the parties

The general rule is that there "is no duty to protect others against harm from third persons." W. PAGE KEETON, ET AL., PROSSER AND KEETON, ON THE LAW OF TORTS § 56 at 385 (5th ed. 1984). "When addressing the duty to control the conduct of others, the courts of Indiana have generally followed the principles set forth in the *Restatement (Second) of the Law of Torts.*" *Cole v. Indiana Dept. of Correction and State of Indiana,* 616 N.E.2d 44, 46 (1993). The Restatement recognizes an exception to the general rule of no duty when a special relationship exists between the actor and the third person, which imposes a duty upon the actor to control the third person's conduct. *Id. See also,* RESTATEMENT (SECOND) OF TORTS § 315 (hereafter, "section 315").

Even more particularly, the *Restatement (Second) of Torts,* section 319 (hereafter "section 319") speaks directly to the imposition of a duty on those who are in charge of other persons with dangerous propensities. That section provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

What it means to "take charge of a third person" under section 319 yields no a bright line approach. For example, in *Estate of Mathes v. Ireland,* 419 N.E.2d 782 (Ind.App. 1981) the court was confronted with a situation where an allegedly insane and violent twenty-year old man was residing with his mother and grandparents giving rise to (according to the plaintiff) "a responsibility to supervise [him] and control his activities." *Id.* at p. 784. Because the mother and grandparents allegedly failed to control the young man he abducted and killed a woman. The trial court dismissed the Plaintiff's claim against the mother and grandparents but the Indiana Court of Appeals reversed, holding that dismissal was premature. Citing section 319, the court observed that any duty on the part of the mother and grandparents depended upon the actual assumption of care and control of someone known to be dangerous. *Id.* That is, "for the *duty* to exist there must therefore not only be an actual taking charge of the third person, there must also be a knowledge of the likelihood that he will cause bodily harm." *Id.* Since the plaintiff in *Estate of Mathes* had at least pled an actual taking charge of the twenty-year old man the motion to dismiss was denied, even though the court of appeals expressed grave reservations "that any of [the plaintiff's] arguments [would] prove successful." *Id.*

The Indiana Court of Appeals had an opportunity to consider section 319 again in *Sports, Inc.* There, an intoxicated driver caused an accident in the parking lot of the defendant's business and the defendant's security guards were summoned. However, rather than arresting or detaining the intoxicated driver, they turned him over to his relatives who drove him away in his own truck. Shortly after leaving the parking lot the intoxicated person was driving the truck again and it collided with an automobile driven by the plaintiff. In the Plaintiff's case against the business owner, the question was whether it owed a duty to the motoring public such that it should have detained the intoxicated motorist. *Sports, Inc.,* 431 N.E.2d at 535. In analyzing the question of duty, the Indiana Court of Appeals considered section 319 and determined that it did not apply to the facts of the case. 431 N.E.2d at 536. Indeed, the court distinguished those cases which relied upon section 319 because in almost all such instances the relationships were "continuing, well-established, and, in all but the *Mathes* case im-

posed by court order." *See* 431 N.E.2d at 536 n. 2. In discussing the right to control third persons generally under the section 315 the Indiana Court of Appeals noted:

> "[I]n Indiana and elsewhere the courts have shown great reluctance to require an individual to take any action to control a third party when there is no special relationship between them. When a special relationship does exist, the responsibilities it engenders are limited."

*Sports, Inc.,* 431 N.E.2d at 538. As the Court of Appeals went on to observe, in all cases imposing liability for failure to control the conduct of a third party there must not only be the need for special supervision or protection, but there must also be "the right to intervene or control the actions of a third person." *Id.* As the Court of Appeals in *Sports, Inc.* summarized the point:

> "[W]e know of no case from any jurisdiction which imposes a duty to control a third person when no right to control exists. The right to control another person's actions is essential to the imposition of this duty."

*Id.* In *Sports, Inc.,* the upshot was that summary judgment was appropriate because the defendant had no right to control the intoxicated driver as a matter of law.

More nearly to the point, a few courts in other jurisdictions have recognized that under appropriate circumstances, a privately operated halfway house for convicted prisoners may be held liable to a third person for injuries caused by one of those prisoners. *Annotation* "Liability of private operator of 'halfway house' or group home housing convicted prisoners before final release for injury to third person caused by inmate." 9 A.L.R. 5th 969 § 2(a) (1993). Nonetheless, it is still necessary for the injured party to show that the halfway house had sufficient control over the convict to warrant liability, perhaps through an examination of the halfway house's contract with the applicable Department of Correction. *Id.* at section 2(b).

Bailor points to two cases that arguably stand for the proposition that a legal duty arose in the Salvation Army under the facts of this case. *See, Dudley v. Offender Aid and Restoration of Richmond, Inc.,* 241 Va. 270, 401 S.E.2d 878 (1991); *Doe v. United Social and Mental Health Services, Inc.,* 670 F.Supp. 1121 (D.Conn.1987).

In *Dudley,* a convicted felon serving a prison sentence was permitted to reside in a privately operated "halfway house" and while living there, left the premises and broke into the residence of a woman whom he then killed. The decedent's administrator claimed negligence and sued the operator of the halfway house for allegedly failing to exercise reasonable control over the felon. The trial court sustained a demurrer and dismissed the case. Assuming the facts alleged in the complaint to be true, the question on appeal was whether the operator of the "halfway house" had a duty to exercise reasonable care to control the felon so as to prevent him from causing harm to the decedent.

In resolving the issue, the *Dudley* court observed that the felon had a long-standing criminal record, had been denied parole twice, and was not due for mandatory release until 1991. Nonetheless, in 1987 (four-years prior to his possible release) he was placed at the halfway house (a placement designed only for pre-releasees) despite the fact that he met none of the contractual criteria for placement (as set forth in the contract between the Virginia Department of Correction and the halfway house). Moreover, the halfway house residents "were essentially unsupervised" and "security measures were practically non-existent." *Id.* at p. 274, 401 S.E.2d 878. The prescribed "sign-out"/"sign-in" system was not enforced. *Id.* The contract with the Department of Correction also required the halfway house to notify the Department whenever an inmate was absent without leave for more than two hours—a requirement routinely overlooked. *Id.* at 274, 401 S.E.2d 878.

In reversing the earlier dismissal, the *Dudley* court distinguished prior Virginia cases which had held that a parole officer had not "take[n] charge of" a parolee within the meaning of section 319 and thus had no duty to persons injured by the parolee under the officer's supervision. *Id.* at p. 275–76, 401 S.E.2d 878 (citing *Fox v. Custis,* 236 Va. 69, 372 S.E.2d 373 (1988)); *Marshall v. Win-*

*ston*, 239 Va. 315, 389 S.E.2d 902 (1990). While acknowledging this prior line of cases, the Virginia Supreme Court viewed the control exercised by the halfway house in *Dudley* as something different from a parole officer's statutory duty to merely "supervise and assist" a parolee. For example, in *Dudley*, the inmate was received by the halfway house while in the custody of the Department of Correction; thus, the Virginia Supreme Court concluded: "[A]nyone assuming that custody from the Department necessarily became '[o]ne who takes charge' of [the inmate] within the meaning of *Restatement* section 319." *Id.* 241 Va. at p. 276, 401 S.E.2d 878. Moreover, the halfway house had a contractually imposed responsibility "for very close and continuous supervision of [the Department of Correction] inmates." *Id.* The Virginia Supreme Court contrasted this with the limited statutory duties imposed upon parole officers (such as in *Fox*) and noted that the halfway house "was required to maintain stringent security measures and sign-out procedures, and to report to the Department of Correction any unauthorized absence of an inmate in excess of two hours." *Id.* Thus, the custodial duties of the halfway house "far surpassed those of a parole officer and met the criterion of *Restatement* section 319 for 'one who takes charge' of its inmates." *Id.*

In the *Doe* case, an obviously dangerous inmate was paroled to a halfway house; less than a month later he left without permission, traveled to a neighboring town (a violation of his parole) and kidnapped a woman. *Doe*, 670 F.Supp. at 1122. She sued the halfway house, and others, alleging negligence. The halfway house moved for summary judgment contending that as a matter of law they owed her no duty of care. *Id.* at 1130. The district court denied the motion because the record reflected that the halfway house knew that the inmate had left without permission, that they had reason to suspect that he was violating his parole by drinking, and that he was considered potentially dangerous and in need of mental health treatment. *Id.* at 1132–33. The record also raised at least the inference that the halfway house, in their acceptance and supervision of

such a dangerous inmate, had arguably violated state standards imposed upon them by the "Department of Correction Policy and Procedures Manual for Contracted Agencies" as well as its own "program criteria" established pursuant to the state policy manual. *Id.* at 1133. In sum, the court determined that there was sufficient evidence to have the question of the halfway house's duty to Doe decided by a jury and the motion for summary judgment was denied. *Id.* at 1132.

Cases from other jurisdictions on similar facts have reached opposite conclusions. In *King v. Durham County Mental Health Developmental Disabilities and Substance Abuse Authority*, 113 N.C.App. 341, 439 S.E.2d 771 (1994) the court was faced with a suit following the fatal shooting of a person by a seventeen year old juvenile who had a history of drug abuse and violent crime. The juvenile had been transferred from a state training school to a "high management facility" [14] operated by "Lutheran Services" which provided residential treatment to members of a class consisting of minors with serious emotional or mental handicaps accompanied by violent or assaultive behavior. *King*, 439 S.E.2d at 772. Lutheran Services was responsible for providing evaluation and treatment to the residents and providing facilities "equipped to prevent residents from escaping and posing a threat to the community." *Id.* In fact, the particular juvenile involved was required to stay at the facility at all times in order to prevent his continued abuse of drugs; this was particularly true since the possibility of his escape posed a clear and present danger to the general public. *Id.* In any event, shortly after his placement at the facility the juvenile left through an unlocked door in violation of the facility's rules. *Id.* Lutheran Services, in violation of regulations, failed to inform the police that the juvenile had left and failed to return him to the facility. Ultimately, the juvenile shot and killed the victim.

The plaintiff's decedent filed a complaint against Lutheran Services alleging that the defendants did not evaluate the juvenile,

---

**14.** In North Carolina, a "high management facility" is not locked, but it is to have twenty-four hour awake staff, and security precautions are to be taken. 439 S.E.2d at 773.

failed to provide a secure facility, and had neglected to seek his return after he left. *Id.* at 772–73 The trial court dismissed the complaint for failure to state a claim. *Id.* at 773. The question before the North Carolina Court of Appeals was whether, on the record before the court, Lutheran Services had a duty to the plaintiff's decedent. *Id.*

In resolving the issue, the court determined that there was no dispute that the defendants were aware that the juvenile had a propensity for violence and that they were responsible for providing treatment for him. The question, however, turned on whether they had custody of him, or had the ability or right to control him. Ultimately, the court determined that the juvenile was at Lutheran Services voluntarily, and they could not have mandated his return absent a court order. *Id.* at 775.

> "Thus, although the defendants had an obligation to insure the safety of the community, may have had an obligation to report [the juvenile's] absence from [the high management facility] to the police and an obligation to seek his return, because there is no evidence of a court order requiring his participation in the ... program, they had no legal right to mandate his return to the facility."

*Id.* As a consequence, the court held that as a matter of law the defendants did not have custody of the juvenile and had neither the right or ability to control him. *Id.*

In *Erickson v. Curtis Investment Co.,* 432 N.W.2d 199 (Minn.App.1988); *aff'd* 447 N.W.2d 165 (Minn.1989), a parolee, referred to a halfway house for alcohol treatment by the Minnesota Department of Correction, attacked a woman in a downtown Minneapolis parking garage. After she sued the halfway house, and others, summary judgment was granted to the halfway house. The issue before the Court of Appeals was whether the halfway house owed a duty to control the parolee's conduct. In a rather brief discussion, the Court of Appeals noted that there was no evidence to indicate that the halfway house had any ability to control the parolee. As the Minnesota Court of Appeals noted:

> [The halfway house] is a non-custodial home and [the parolee] was free to go about his business until 12:00 midnight when he was required to be in his room. He was only at [the halfway house] for one hour prior to the rape on December 7, 1983, when he stopped to sign a release allowing [the halfway house] to obtain copies [of his Department of Correction records]. We therefore hold that no duty is owed by [the halfway house] and summary judgment was properly granted.

432 N.W.2d at 203.

What seemingly evolves from these cases is the apparent need for the court to examine the interrelationship between the halfway house and the placing agency. *See King,* 113 N.C.App. 341, 439 S.E.2d at 775; *Dudley,* 241 Va. 270, 401 S.E.2d at 881. *See also,* 9 A.L.R.5th 969 § 2(b). In addition, the court should determine whether the halfway house had sufficient control over the person so as to warrant liability. *King,* 113 N.C.App. 341, 439 S.E.2d at 775; *Dudley,* 241 Va. 270, 401 S.E.2d 878; *Erickson,* 432 N.W.2d 199; *Doe,* 670 F.Supp. 1121. After all, under Indiana law, there must at least be a "right to intervene or control the actions of [the] third person." *Sports, Inc.,* 431 N.E.2d at 538.

■ In the factual matrix of this case, the Salvation Army Facility as a matter of law had neither sufficient custody, nor control, of Holly such that a legal duty to Bailor can be imposed upon it.

For example, while Holly clearly resided at the Salvation Army Facility, he remained under the legal custody of the Attorney General. (Wilson Declaration, exhibit F Furlough, Application Approval, and Record and Transfer Order); *See also, Perez–Calo v. U.S.,* 757 F.Supp. 1 (D.Puerto Rico 1991). As a pre-release inmate, Holly was under the least restrictive conditions possible. This was consistent with the view that (unlike the inmate in *Dudley* ) Holly was soon to be released from federal custody with practically no restrictions whatever. (Rowland dep. pp. 64–5).

In addition to not having legal custody of Holly, the Salvation Army had no real ability or right to control him. The scope of the Salvation Army's work generally required them to "furnish the necessary facilities,

equipment and personnel to provide for the safekeeping, care and assistance of persons residing" in the work release center. ("Statement of Work," hereafter "SOW") p. 2.[15] The Salvation Army had only minimal input into the contents of the SOW. (Rowland dep. pp. 14, 56.) In fact, the SOW was largely imposed on halfway house contractors around the country by the BOP. *Id.* As the SOW prescribed, the Salvation Army could not use physical force to restrain a resident except "in instances of justifiable self-defense, prevention of loss or damage to property or person, or the prevention of self-inflicted harm, and only to the degree necessary." (SOW, p. 3; Rowland dep., p. 37) Salvation Army personnel were not authorized to possess lethal weapons on duty. (SOW p. 3) While residing at the halfway house, Holly was not permitted to perform work for the Salvation Army, except that he might be required to maintain his own living area. (*Id.* p. 6.) "Extra duty" could only be imposed for minor rule infractions, and could only include occasional lawn mowing or food preparation. (*Id.* and Rowland dep., p. 39) Holly was relatively free to leave the facility provided that he executed a sign-out sheet. (SOW p. 14). Other than for employment, Holly was to be in the center by 11:00 p.m. each night. (*Id.*) Holly could also obtain furloughs for more extensive absences and travel. (*Id.* pp. 14–15.) Holly's room in the halfway house could only be locked from the inside, *not by the staff from the outside.* (Rowland dep., p. 34) In fact, the halfway house had no detention facilities at all. (*Id.*) The entire facility was locked only to outsiders, and not to those people leaving. (*Id.* p. 35) Moreover, the Salvation Army only had independent discretion to impose sanctions on a resident for the most minor of prohibited acts. (SOW attach. A, pp. 1–5, 17). Minor sanctions of a more serious nature, and major sanctions, required approval from the BOP CCM who was the Salvation Army's technical representative. (*Id.* pp. 1, 31). In

fact, the BOP representative had sole discretion whether to increase the severity of the sanctions recommended by the Salvation Army. (SOW p. 1, attach. A). It was not until 1989 that a new SOW clarified that the contractor was to notify the U.S. Marshal and the BOP representative immediately upon an escape. (February 1989 SOW, p. 57). So, the Salvation Army facility from which Holly escaped was not a detention facility, the residents were not physically restrained, and they were reasonably free to depart subject to such sanctions as may be imposed upon them by the courts or the BOP. (Rowland Affidavit, p. 7).

In Indiana, "the right to control another person's actions is essential to the imposition of the duty described in the section 315, and section 319. *Sports, Inc.*, 431 N.E.2d at 538. However, as catalogued above, the SOW between the BOP and the Salvation Army reflects that the Salvation Army had no right to control Holly in any meaningful sense. In fact, it was within BOP's sole discretion whether Holly was to be removed from the halfway house and returned to prison. (Rowland dep., p. 57). While the Salvation Army could call the U.S. Marshal's about an escape, the Marshal's would only respond if the BOP told them to do so. (Rowland dep., pp. 43–4; Hall dep., pp. 28–9) It was therefore totally within the discretion of the BOP whether a warrant would issue, or whether the Marshals were to be summoned following an escape. (*Id.*) In short, the Salvation Army had the responsibility to house Holly in a safe, clean and nurturing environment (SOW p. 2); but virtually no say-so as to effectuating meaningful control over him—at least to the extent that it would have impacted on what ultimately occurred here.

Instructively, the "right to control" has been equated with the "legal right to mandate [an inmate's] return to the facility." *King*, 113 N.C.App. 341, 439 S.E.2d at 775. Once Holly left, the Salvation Army had no

---

**15.** As earlier noted at fn. 4 two different versions of the "Statement of Work" have been offered to the Court. *See also*, Exhibit B to the Declaration of Gary Wilson. The government contends that the June 1987 SOW applies rather than the 1989 version submitted by the Salvation Army. The Court having examined both SOWs, has deter-

mined that any differences are immaterial to the pending motions. Nevertheless, for purposes of consistency, and unless otherwise noted, references to the SOW in this Memorandum of Decision and Order will refer to the June 1987 version.

legal right to mandate his return. He remained under the custody of the Attorney General, and the BOP, and all the Salvation Army could do was notify the U.S. Marshal of Holly's escape and file an incident report. (*See* February 1989, SOW p. 57). In that regard, the Salvation Army's authority was considerably less than the halfway house in *Doe*, which apparently had some responsibility for the inmate's custody, at least to the extent that they could have brought "him back into custody immediately." *See Doe*, 670 F.Supp. at 1133.[16] As a result then, under Indiana law the Salvation Army had no right to control Holly, which means they had no duty to Plaintiff as a matter of law. *Sports, Inc.*, 431 N.E.2d at 538.

### 2. Foreseeability

■■■ Another factor that needs to be balanced in determining the question of legal duty is whether the Plaintiff was a foreseeable plaintiff injured by a foreseeable risk. *Webb*, 575 N.E.2d 992, 996–7. The Indiana Supreme Court has discussed the point:

> In analyzing the foreseeability component of duty, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. "The duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty." *Thiele v. Faygo Beverage, Inc.* (1986), Ind.App., 489 N.E.2d 562, 574. Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. Thus, part of the inquiry into the existence of a duty is concerned with exactly the same factors as is the inquiry into proximate cause. PROSSER & KEETON ON TORTS, § 53 (5th ed. 1984). Both seek to find what consequences of the challenged conduct should have been foreseen by the actor who engaged in it. We examine what forces and human conduct should have appeared likely to come on the scene, and we weigh the dangers likely to flow

from the challenged conduct in light of these forces and conduct. HARPER, JAMES & GRAY, THE LAW OF TORTS Vol. 3 § 18.2 (2d ed. 1986).

*Id.* at 997.

■■■ In Indiana, this foreseeability question can be resolved as a matter of law. *Fawley v. Martin's Super Markets, Inc.*, 618 N.E.2d 10 (Ind.App.1993). Such foreseeability "does not mean that the precise hazard or exact consequences should have been foreseen, but neither does it encompass anything which might conceivably occur." *Crull v. Platt*, 471 N.E.2d 1211, 1215 (Ind.App.1984).

Viewing the evidence in a light most favorable to the Plaintiff, it is clear that the Salvation Army had at least some idea that Holly had "a couple of bank robberies," a prior record of escape, and a long ago rape charge (about which little was known). (Hall dep., pp. 14, 23, 31). While the Salvation Army endeavored to find out more about the rape charge, the BOP had no further information to give. (Hall dep., pp. 14–15). The Salvation Army also knew at least that Holly had previously been absent without leave from a community based program in Fort Wayne, Indiana. (Hall dep., pp. 34–35; Brantford Dep. pp. 11–12). Of course, the Salvation Army realized that Holly was an "exception case"; that is, a high risk person with a violent history and "high level crimes." (Hall dep., p. 10). But this only meant that he was to be watched "a little closer." (Hall dep., p. 12). While the Salvation Army also knew that Holly was familiar with PFM, it does not appear that the Salvation Army knew that Holly had had contact with them in Fort Wayne. (Brantford Dep., p. 14).

If the Salvation Army believes that an inmate should not be accepted into the program they have to justify and "prove," based on their contract with BOP, that he cannot come into the program based on present information. (Hall dep., pp. 16–17). This basically means that only a select few can be rejected without BOP challenge. (Hall dep., pp. 16–17). In any event, Holly's anticipated stay was going to be short—with "good

---

**16.** In *Dudley,* the question of returning the inmate to the halfway house did not arise since he voluntarily returned to it following his crime.

time," he could anticipate release on June 8, 1991. (Rowland dep., p. 65).

Holly's orientation at the Salvation Army included a review of listed disciplinary violations and the potential sanctions that could be imposed. (Brantford dep., p. 21). Thus, Holly would have learned that if he failed a mandatory drug test his residency at the Salvation Army would be revoked, he would be confined at the MCC, and he might lose his accumulated "good time." (Rowland dep., pp. 71–73).

■ In examining foreseeability, the focus becomes, "what consequences of the challenged conduct should have been foreseen by the actor who engaged in it." *Webb,* 575 N.E.2d at 997. Essentially, the Plaintiff argues that by accepting Holly with little or no anticipated supervision, and then by failing to detain him when revocation appeared imminent, the Salvation Army made Holly's escape to Fort Wayne and the rape of Bailor reasonably foreseeable.

However, when Holly escaped on foot he had little money, had recently been using cocaine, and was now free to roam a vast metropolitan area. While the Salvation Army knew that Holly had some past connection to Fort Wayne, they had no indication that he was returning there, nor does it ineluctably follow that he would be motivated to do so (particularly since that was one place where he might be recognized). In contrast to *Doe,* the Salvation Army did not know the specific town where Holly could be located, did not know his general location within a specific town, and had no personal sense that Holly was dangerous. *Cf. Doe,* 670 F.Supp. at 1130–33. To say that it was foreseeable that Holly would surface a few days later in a different state some 150–miles away is tantamount to extending the Salvation Army's duty of reasonable care to the world at large—a result counseled against by the Indiana Supreme Court in *Webb,* 575 N.E.2d at 997. Essentially what Bailor impermissibly argues is that the alleged deficiencies of the Salvation Army should have led them to foresee that they were creating an unreasonable risk that Holly would flee and that a totally unknown person would be injured by him. *Id.*

■ In that regard, there is no evidence to suggest that Holly was very much different from the thousands of other inmates that regularly pass through halfway houses in the United States. Although in some cases it is reasonably foreseeable that an inmate is likely to escape (given adequate opportunity and incentive) the facts of this case do not give rise to an inference that Holly was a foreseeable escape risk who would cause harm to others. *See NIPSCO v. Sell,* 597 N.E.2d 329, 334 (Ind.App.1992). After all, the worst thing that could have happened to Holly as a result of his alleged cocaine usage was that he would be sent back to the MCC until his "max out date" in September 1991—a mere four-months away. Nothing that Holly had done while at the Salvation Army gave rise to even an inference that it was foreseeable that he would escape when faced with only such mild administrative sanctions. In that regard, it was not reasonably foreseeable that advising Holly of his positive urinalysis from cocaine (something Holly easily could have presumed would occur) would result in his bolting out the door to become an immediate threat to women. As stated in *Webb,* 575 N.E.2d at 997 the "forces and human conduct" appearing "likely to come on the scene" as a result of Holly's leaving the Salvation Army simply do not give rise to even an inference that Bailor was foreseeably at risk.

### 3. Public Policy

The final factor to be considered and weighed in determining the existence of a duty is public policy concerns. Here, the public policy strongly weighs against imposing liability upon the Salvation Army. When Congress passed The Sentencing Reform Act of 1984, it included the following provision.

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under condition that will afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community.

18 U.S.C. § 3624(c). This provision evidences Congress' commitment to provide rehabilitative pre-release programs to inmates in federal custody. One of the ways the BOP has implemented this mandate is through the use of CCC's—a community-based residential program designed to "assist offenders in becoming law-abiding, self-sufficient, contributing members of the community." (SOW, p. 1). These Centers serve a dual role; they "assist offenders in making the transition from confinement to community living," while also relieving institutional overcrowding and costs. (U.S. reply bf., Exh. C, Prog. Statement 7333.2, p. 2); *See also,* Dora L. McNew, *An Introduction to Community Corrections,* 11 HAMLINE J. PUB. L. & POL'Y 31 (1990).

Rehabilitation is, of course, the primary function of any CCC. J. Michael Quinlan, *Intermediate Punishments as Sentencing Options,* 66 S. CAL.L.REV. 217, 222 (1992). A CCC is designed to provide a transitional period between incarceration and supervised release, and was formed as an alternative to traditional parole. Dora L. McNew, *An Introduction to Community Corrections,* 11 HAMLINE J. PUB. L. & POL'Y 31 (1990). "Although close supervision was originally an integral part of [probation and parole], modern practices seldom provide such supervision." *Id.* As a result, these means have not been generally effective. In fact, "[t]wo-thirds of prisoners released on parole return to prison in two years and most recidivism occurs with[in] twelve months of release." *Id.*

Unlike parole or probation, the CCC places the offender into a slightly more monitored environment—*i.e.,* a residential facility with a curfew policy, sign-in/sign-out procedures and strict travel restrictions. (SOW). The CCC also provides the offender with job placement, counseling, drug treatment, and other transitional assistance. (SOW, p. 1); J. Michael Quinlan, *Intermediate Punishments as Sentencing Options,* 66 S.CAL.L.REV. 217, 222 (1992). Thus, a CCC offers the offender a more gradual transition into society than immediate parole. Initial

studies at least suggest that as a result of this, offenders who go to a CCC enjoy a lower rate of recidivism. *See generally, Id.;* Jeff Potts, *American Penal Institutions and Two Alternative Proposals for Punishment,* 34 TEX.L.REV. 443, 509–511 (1993).

In addition to a greater chance of rehabilitation, CCC's also help to alleviate the societal problem of prison overcrowding and the rising cost of incarceration. In 1992, with over 66,000 inmates, the BOP was operating at 148% of capacity. J. Michael Quinlan, *Intermediate Punishments as Sentencing Options,* 66 S.CAL.L.REV. 217, 221 (1992). Since the passage of the 1984 Sentencing Reform Act, inmates close to release can serve up to the last six months of their sentence at a CCC. 28 U.S.C. § 3624(c). In 1992, the BOP averaged 4332 inmates a day in its CCC facilities. J. Michael Quinlan, *Intermediate Punishments as Sentencing Options,* 66 S.CAL.L.REV. 217, 221 (1992). As a result, CCC placements have made a significant dent in the overall prison population.

As for finances, it has been observed that "the average cost to house an inmate in a CCC is thirty-two dollars per day, in contrast with approximately forty-eight dollars per day for the average Bureau of Prisons facility".[17] *Id.* Moreover, confinement in a CCC is not free to the inmates because the BOP has the authority to collect a subsistence from them. "In 1991, the average inmate paid $5.58 per day to stay in a community facility," resulting in approximately $7.9 million being returned to the government. *Id.*

What all this adds up to is that use of a CCC clearly serves an important governmental interest. It provides a valuable rehabilitative service, and also helps reduce prison overcrowding and costs. Under the provisions of Title 18 U.S.Code, Sections 4002, 4082, 5013, and 5040, the BOP contracts with State and local governments and private organizations to provide these services. (SOW, 1). To impose the potentially ruinous legal duty Bailor suggests here, would clearly put the availability of these valuable services at risk and would deter the establishment or

---

17. For a more in-depth discussion, *see,* J. Michael Quinlan, *Intermediate Punishments as Sen-* *tencing Options,* 66 S.CAL.L.REV. 217, 222 (1992).

retention of BOP halfway houses by private organizations. This would mean fewer CCC's, higher *per diem* charges, and a resulting increase in the total prison population. Thus, the BOP's ability to use CCC's as a means of complying with its obligations under 18 U.S.C. 3624(c) would be hampered—a result clearly contrary to expressed public policy. So, this final factor in the duty analysis weighs heavily against Bailor.

█ Having considered and balanced all three duty factors under Indiana law, the Court must conclude that the Salvation Army owed no duty to Bailor as a matter of law. Accordingly, the Salvation Army's motion for summary judgment should be granted.[18]

### C. The United States of America

Bailor has brought her claims against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 *et seq.* ("FTCA"). Bailor's first claim against the United States is premised upon the alleged negligent acts of the BOP, a federal agency. Second, Bailor claims that the United States is vicariously liable for the alleged negligence of the Salvation Army, who she claims was acting as an agent of the BOP. The United States has moved for dismissal of both claims pursuant to Rule 12(b)(1) by arguing that it enjoys sovereign immunity (which it has not waived) and that as a result, this Court is deprived of subject matter jurisdiction. In addition, the United States objects to venue and has moved for dismissal pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure.

#### 1. Standard of Review

█ Under the FTCA the waiver of "sovereign immunity is a jurisdictional prerequisite." *Bank One, Texas, N.A. v. Taylor,* 970 F.2d 16, 34 (5th Cir.1992); *cert. denied* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993). That is, "[t]he United States may not be sued without its consent. The absence of consent is a fundamental, jurisdictional defect." 14 WRIGHT, MILLER, COOPER, FEDERAL PRACTICE AND PROCEDURE,

§ 3654, p. 186–190 (1985). Simply stated, where there has been no waiver, the district court lacks subject matter jurisdiction over the action.

█ Generally,

the ... Court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action. The ... court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. *First National Bank of Chicago v. Steinbrink,* 812 F.Supp. 849, 851 (N.D.Ill.1993). [The Court may] weigh the conflicting evidence in arriving at the factual predicate upon which to base the legal conclusion that subject matter jurisdiction either exists or does not. In cases where the jurisdiction of the court is challenged as a factual matter, the party invoking jurisdiction has the burden of supporting the allegations of jurisdictional facts by competent proof.

*Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979). In the context of sovereign immunity on a motion to dismiss the Supreme Court has recently held that "for a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions" do not fall into one of the exceptions to the waiver of immunity. *U.S. v. Gaubert,* 499 U.S. 315, 324–25, 111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991). *See also, Davis v. C.I.R.,* 674 F.2d 553, 556 (6th Cir.1982).

#### 2. Jurisdiction over the Claim of BOP Negligence

Count IV of Bailor's Amended Complaint alleges that the BOP negligently placed Holly at the Salvation Army, gave inadequate directives for monitoring Holly, and failed to enforce existing rules concerning the notification of proper authorities. (Plaintiff's brief in opp. to U.S. motion to dism., p. 1). In

---

18. As noted in section IV, A, 3, *supra,* granting summary judgment on Bailor's negligence claims also requires summary judgment on Darryl Bail-

or's loss of consortium claim. *Nelson,* 598 N.E.2d at 558.

response, the United States contends that this claim is barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680.

> Generally, the FTCA authorizes suits against the United States for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. 1346(b). However, the Act contains a number of exceptions to this waiver of sovereign immunity, including an exception that provides that there is no liability for:

> Any claim ... based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. 2680(a).

 In determining whether the discretionary function exception applies, the court must consider two factors. First, "whether the action [involved] is a matter of choice for the acting employee.... [C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz by Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (citations omitted).

> Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.

*Id.* Second, the decision must be based on considerations of public policy. *Id.* at 537, 108 S.Ct. at 1959. The discretionary function does not shield all legislative and administrative decisions but only those "'grounded in social, economic, and political policy.'" *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)). With these principles

in mind, we turn to the question of whether the six separate acts of alleged BOP negligence as set out in Count IV of Bailor's First Amended Complaint are discretionary in nature.

### a. The BOP negligently failed to assess the appropriateness of Holly's placement at the Salvation Army Facility.

 Bailor's first allegation is that the BOP negligently approved Holly's transfer to a CCC. Of course, the decision to place Holly at the Salvation Army facility was part of the BOP's authority to classify inmates and generally, "[t]he discretionary exception to the FTCA bars any recovery predicated on the classification of inmates." *Reed v. Hadden*, 473 F.Supp. 658, 660 (1979). Bailor contends, however, that the discretionary function exception does not apply here because, in placing Holly at the Salvation Army, the BOP violated several administrative regulations which "specifically prescribe[d] a course of action," leaving BOP employees with no choice but to "adhere to the directive[s]." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958–59. More to the point, Bailor argues that the United States cannot meet the first factor of *Berkovitz* because placement of Holly at the Salvation Army Facility was not a BOP "choice," since the BOP's own regulations declared Holly ineligible for such a transfer.

Bailor is correct, of course, that the BOP did not have discretionary power to ignore the required steps of the decision-making process. *Payton v. United States*, 679 F.2d 475, 481 (5th Cir.1982). However, in order to examine that process in connection with the facts of this case we start with the BOP's Congressional mandate:

> to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community.

18 U.S.C. § 3624. It was pursuant to this mandate that Holly was placed at a CCC.

BOP's authority for placing Holly at the CCC stems from United States Code, Title 18 section 3621(b), which provides that

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correction facility [19] that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable. . . .

However, inmate placement at a CCC is further governed by BOP's own administrative regulations, and it is these regulations which Bailor claims were violated. Specifically, Bailor alleges that the BOP violated three Program Statement Directives and one Operations Memorandum guideline. These regulations provide step-by-step directives for the referral and transfer of federal prisoners to CCC's, and establish, among other things, the criteria by which inmates may be considered for placement at a CCC.

Bailor first alleges that Holly's transfer to the Salvation Army was in violation of Program Statement 7300.2, paragraph (5)(c) which provides:

> Inmates who may, when released, present a continuing threat to public safety, such as inmates with convictions for serious or repetitive crimes of violence against persons, those with long histories of organized criminal activity, and leaders of major narcotic conspiracies, will not ordinarily be placed in a CTC. If, in cases of this type, a warden believes a strong need for CTC placement exists, the length of the placement may be less than would otherwise normally be allowed. The rationale for such placement must be documented in the inmate's file and included with the referral material.

(P.S. 7300.2 p. 2–3, ¶ 5(c)). Bailor argues a violation occurred when the MCC Warden failed to place the necessary documentation regarding the rationale for Holly's transfer

in the file and referral material despite the fact that Holly was a violent offender. (Plaintiff's sur-reply bf., p. 6).

This argument presumes too much, however, because the obligation to include such a memorandum only arises when a determination has been made that the inmate "present[s] a continuing threat to public safety." Of course, inmates that have been convicted of serious or repetitive crimes of violence are examples of those who may present such a threat. However, Bailor's *post hoc* argument that Holly posed a continuing threat to public safety, or at least had been convicted of serious or repetitive crimes of violence, falls short of establishing a violation of the regulation. Rather, it constitutes an impermissible challenge to the BOP's discretionary determination that Holly was not dangerous. As such, it must fail.

■ The question of whether an inmate poses a threat to public safety is inextricably linked to the discretionary function of inmate classification. Bailor must "allege that the . . . breach[ ] [of] duty [is] sufficiently separable from the decision-making function to be non-discretionary and outside of the exception. [She] may not withstand a motion to dismiss by alleging that the [BOP's] decision was wrong." *Payton,* 679 F.2d at 482. Bailor essentially argues that the criminal history documented in Holly's pre-sentence report demonstrates that Holly was a violent offender. Moreover, Bailor observes that although the Warden and the unit team considered Holly's bank robbery charge, they failed to give adequate attention to his history of domestic violence and drug use, as well as his arrest for attempted robbery and carrying a concealed weapon. However, more is needed than to simply allege a "fail[ure] to acquire, read or give adequate consideration to" such information. *Id.*

The acquisition and examination of records on which the [BOP] bases its ultimate decision necessarily implicates its discretionary function. In fulfilling this task, the [BOP] must exercise its judgment by determining

---

**19.** The statutory term "facility" includes a residential community treatment center. *See* 18 U.S.C. 4082.

the materiality of certain studies and documents and the propriety of relying thereon in reaching its final judgment. Further, the manner and degree of consideration with which the [BOP] examines these materials is inextricably tied to its ultimate decision.

*Id.* So, the very determination about which Bailor complains, that Holly was not a continuing threat to public safety, became inexorably intertwined with the BOP's permissible discretionary function regarding classifying inmates. Once the discretionary decision was made by the BOP that Holly was not such a prisoner, the BOP's own regulation failed to apply, thus abrogating the need for any supporting memorandum in Holly's CCC placement file. Stated another way, the Warden's failure to include such a memorandum was not a violation of any administrative procedure—leaving the discretion for Holly's placement solely within the hands of BOP and well within the discretionary function exception of the FTCA.

Bailor next asserts a violation of Program Statement 5100.2 Section 12, Paragraph C, ("Program Statement 5100.2") which in relevant part states:

The Warden may now approve transfer to a CTC of an inmate with FGT [forfeited good time], but a memo must be placed in the inmates' file documenting that the Warden was aware of the inmate's FGT status and stating the rationale for the decision.

What makes this regulation arguably relevant is that sometime prior to 1988, while Holly was incarcerated at the Terre Haute federal prison for a bank robbery conviction, he was involved in an altercation and forfeited 20 days of good time credits. As a result of this prior forfeiture, Bailor claims the MCC's Warden was required to include a memorandum acknowledging the forfeiture and stating the rationale for Holly's placement.

However, Holly's particular forfeiture of good time credits on his bank robbery sentence while at Terre Haute had no impact on his "FGT status" while serving the escape sentence at the MCC. A federal prisoner receive[s] credit toward the service of his sentence, beyond the time served, of fifty-four days at the end of each year of his term of imprisonment, beginning at the end of the first year of the term.... [and] credit for the last year or portion of a year ... [is] to be prorated.

18 U.S.C. 3624(b). As the statute goes on to say, if "during that year" an inmate fails to "satisfactorily comply with institution guidelines" the BOP may take away all or a portion of his good time credits. *Id.* However, good time credits impact only on the inmates present sentence, and do not carry over to any other sentence. *Id.* That is, the amount of credit earned or lost in a given year is based solely upon the inmates conduct "during that year." *Id.* So, the fact that Holly forfeited good time in the past, while serving a prior and unrelated sentence, did nothing to trigger the workings of Program Statement 5100.2.

Focusing solely on Holly's sentence he was serving at the MCC, while also seeking a transfer to the Salvation Army Facility, it should be noted that he had already accumulated 54 days of good time (the maximum) and had a projected total of 94 days of good time credits (40 days prorated for the remainder of his sentence). (Sentence Monitoring Reports). In short, Holly had forfeited no good time credits while serving his twenty-four month escape sentence at the MCC. *Id.* This means that Holly's actual FGT status was zero. *Id.* Accordingly, the MCC Warden had no regulatory duty to place a memorandum of explanation in Holly's file.

Bailor's third allegation is that Holly's placement did not comply with Operations Memorandum 91–90(7300)(3) because Holly was placed at the Salvation Army facility for more than 60 days. Bailor contends that this regulation strictly prohibits placement in excess of 60 days for an offender who has exhibited "any use of weapons in current or past offense behavior ... [or] any history of violence." (O.M. 91–90 (7300)(3). This, however, is simply an incorrect reading of the memorandum.

Operations Memorandum 91–90 is a supplement to Program Statement 7300.2 and

provides additional guidance for CCC referral decisions. Paragraph 3 of this memorandum states only:

> Inmates in the following categories are often not appropriate for CCC placement or are placed only for periods not exceeding 60 days.
>
> * * * * * *
>
> B. Any use of weapons in current or past offense behavior.
>
> * * * * * *
>
> E. Any history of violence.

Contrary to Bailor's assertion, the plain language of this paragraph establishes no outright prohibition against placement of offenders who fall into these categories, nor any special responsibilities on the BOP when transferring them. This advisory memorandum was intended only to provide some guidance for determining the appropriateness and duration of a CCC placement and did not "specifically prescribe[ ] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. Thus, although Holly fell into categories "B" and "E" of paragraph three, his placement at a CCC for six months did not violate any mandatory regulation. Rather, the decision to place Holly at a CCC for more than sixty days became a matter of BOP discretion.

Finally, Bailor complains that Holly's referral form was not completed by the BOP in conformity with the directives in Program Statement 7333.2 Section 6(a)(2), which states that "items included in number 12 and 13 [of the referral form] should be as specific as possible and must not just reference the progress report." Item 12 of the referral form provides limited space for "Additional information, including *status of any detainers* and whether there is a *substance abuse history*." Holly's referral forms states:

> As of this date, no detainers have lodged against Mr. Holly. He began using heroin and marijuana in 1967. Records do not reflect any incidents of drug usage during his confinement.

Bailor finds this explanation unsatisfactory, and argues that greater detail should have been provided given Holly's previous placement at the Terre Haute facility for drug treatment, and his alleged Indianapolis drug binge.

In short, Bailor would hold the BOP to an unreasonable and unnecessarily exacting standard. While the BOP was clearly to do more than merely refer to the inmate's progress report, the referral form itself was never intended to replace the accompanying information packet (which included not only progress reports but also a pre-sentence report from the U.S. Probation Department). That is, the BOP was not required to give an extensive narrative regarding Holly's entire substance abuse history, but rather, was simply to answer the question posed—"whether [Holly had] a substance abuse history," at all. Notably, the answer space provided under item 12 comprises only 1/2 of an inch—implying only a brief response. Nonetheless, the unit team concisely answered the question by identifying Holly's previous drug problem, its apparent onset, the drugs involved, and his status during confinement. Under the circumstances, this brief response is in compliance with the program statement.

Bailor goes on to argue that the BOP's response to item 13 of the referral form, asking for Holly's "specific pre-release needs," also lacked the requisite specificity. As to that item the BOP noted,

> "Mr. Holly needs placement in a community corrections center to facilitate his return to the community. Specifically, this period will afford him the opportunity to establish residence, and reestablish family and community ties. He will be employed at the O'Hare People Mover Project as a construction laborer."

Bailor's criticism of this answer is two-fold. First, she contends that it does not specify that Holly requires drug aftercare. However, the reason for this omission can be quite simply explained; item 7 of the same referral form specifically inquires into the type of *aftercare* Holly will require, to which the BOP responded with *drug treatment*. Thus, it is obvious that this specific need had already been identified by the BOP, and bore no repeating a mere half-page later.

██ Moreover, to the extent that Bailor is complaining that the BOP wrongfully iden-

tified Holly's true needs, she also fails. As noted earlier, "the Plaintiff may not withstand a motion to dismiss by alleging that the [BOP's] decision was wrong," *Payton,* 679 F.2d at 482, because such an allegation is not "sufficiently separable from the decision-making function to be non-discretionary and outside of the exception." *Id.*

Undaunted, Bailor also criticizes the BOP's determination that Holly needed to "reestablish family and community ties." According to Bailor this statement could not possibly meet the specificity requirement because Holly had no family or community ties in Chicago. However, once again, Bailor has not really questioned the specificity of the answer, but rather, its accuracy. As already noted *supra,* such an allegation is insufficient.

So, the upshot is that the BOP violated no administrative procedure or requirements when it referred Holly to the Salvation Army Facility. Accordingly, whether he should have been referred fell well within BOP's discretionary function.

 Moreover, the second prong of discretionary function has also been met because the BOP's choice involved policy considerations. "Prison officials have broad administrative and discretionary authority over the institutions they manage...." *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Decisions whether to transfer inmates like Holly are "based on a combination of factors, many of which are entirely subjective appraisals by [the BOP] based on their experiences.... The Decision frequently rests simply on informed predictions as to what course of action would best serve correctional purposes and 'turns on a discretionary assessment of a multiplicity of imponderables.'" *Burger v. United States,* 748 F.Supp. 1265, 1270 (S.D.Ohio 1990) (discussing the decision to grant Parole). Like parole, the purpose of a pre-release program "is to further the long-range objective of rehabilitating a prisoner and to promote society's interest in restoring a convicted criminal to a normal and useful life within the boundaries of the law." *Id.* (citing *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99

S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979)); *Morrisey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). A pre-release program "also serves the public's interest in alleviating the cost of keeping an individual in prison." *Id.* Thus, the choice to place Holly into a pre-release program was grounded in social and economic policy. *Id.* Accordingly, any claims based on the alleged negligent placement of Holly at the Salvation Army facility are barred by the FTCA's discretionary function exception.

### b. The alleged negligent monitoring, supervision and restriction of Holly by BOP.

Bailor also claims that BOP failed to promulgate or enforce appropriate rules with regard to the Salvation Army's monitoring, supervision and restriction of inmates at the facility. Essentially, the claim is that the BOP did not provide or require adequate security of those inmates residing at the Salvation Army.

 The determination of what is an appropriate amount of security at a correctional facility is clearly a discretionary function. *See, Davis Co.,* 674 F.2d at 557. BOP has a dual obligation in promulgating security regulations for these facilities. These rules must promote the rehabilitation of the inmate, while affording protection to the neighboring public. *Weissich v. United States,* 4 F.3d 810, 814 (9th Cir.1993) (Supervisory plan established by probation officer is discretionary function). These interests may conflict, and sometimes require a careful balancing by the BOP when establishing appropriate guidelines. *Id.* "This balancing of interests necessarily involves policy decisions on matters such as public safety, allocation of scarce resources, and the likelihood of rehabilitation." *Id.* The BOP's determination of the appropriate security at the Salvation Army was a choice grounded in policy concerns and is protected from judicial review under the FTCA's discretionary function exception.

### c. The BOP's policy regarding CCC inmates with positive drug tests.

 Bailor contends the BOP was negligent because it promulgated rules that al-

lowed the Salvation Army to either notify a resident directly that he had failed a drug test, or to alternatively notify the U.S. Marshal's Service. Once again the promulgation of rules relating to the discipline of residents is a discretionary matter. The determination of the appropriate disciplinary measures and enforcement is clearly one that is grounded in public policy. The SOW permits the facility to notify the Marshal's and request immediate detention only when the "center staff believe[s] the resident may escape or is a threat to himself, other residents, staff or the general public." (SOW, p. 32). This rule evidences a balancing by the BOP of the limited resources available to its own agency and the Federal Marshal's office (which would be responding to any detention request) against the important function of maintaining the safety of the public and other CCC residents. This type of balancing represents a policy choice, and is also protected under the discretionary function exception. *Weissich,* 4 F.3d at 814.

#### d. The alleged failure to locate and return Holly after his escape.

Simply stated, the BOP had no duty or authority to locate and return Holly. Rather, their responsibility was to notify the Marshal's Office. (P.S. 7300.08, p. 27, ¶ (H)(2)). Once that was promptly done, it became the sole responsibility of the U.S. Marshal to locate Holly. 28 C.F.R. § 0.111(q). Bailor does not make any allegations that the U.S. Marshal was negligent in its attempt to locate Holly. Even so, such an allegation would be barred by the discretionary function exception. *Redmond v. United States Securities and Exchange Commission,* 518 F.2d 811, 816–817 (7th Cir.1975).

#### e. The alleged failure to notify appropriate individuals and/or law enforcement agencies of Holly's escape.

Bailor's complaint offers no real facts in support of this claim. Her brief in opposition to the motion for summary judgment states

only in conclusory fashion that the BOP "failed to enforce existing rules concerning notification of proper authorities"—but fails to identify any rule that was supposedly violated. In fact, the record clearly demonstrates that the Federal Marshal's office and the BOP's Regional Director were both notified within 24 hours of Holly's escape—all in compliance with the regulations regarding escape. (P.S. 7300.08, p. 27, ¶ (H)(2)). Plaintiff has failed to point to any facts, either in the amended complaint or the record, that supports this claim.

■ To the extent that this allegation could be construed as alleging that the BOP failed to notify PFM of Holly's escape, it too must fail.[20] There were no formal regulations which mandated such a further notification. In the absence of a statutory duty, there is no "legally-enforceable duty on the part of the Government to warn ... victims of criminal activity." *Redmond,* 518 F.2d at 816; *See also, Weissich,* 4 F.3d at 813. Rather, at most, the option to do so (assuming that such an option even existed) was purely a discretionary matter.

> This choice implicate[s] policy concerns.... includ[ing] how much of the agency's resources it should commit to identifying victims, what standard it should adopt to determine which potential victims to notify, and how it should go about notifying them. An analysis of these concerns would likely include consideration of budgetary constraints as well as time and personnel limitations.

*Weissich,* 4 F.3d at 813. (ATF officer's decision not to notify victim of attacker's prior threats was discretionary).

#### f. Other negligent acts or omissions.

■ Bailor's final allegation of negligence makes no reference to any specific conduct but alleges only that the government negligently committed other acts or omissions. Under Federal Rule of Civil Procedure 8, a complaint must set out a generalized statement of facts from which the defendant can

---

**20.** This may be what Bailor is actually claiming. In fact, identical language was used against the Salvation Army in Count I of the amended complaint. In her brief opposing the Salvation

Army's motion for summary judgment Bailor argued that the Salvation Army had a duty to notify PFM.

craft a responsive pleading. *Sidney S. Arst, Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417 (7th Cir.1994). The mere reference to other acts or omissions clearly provides no opportunity to respond. Even under the generous standard of notice pleading such an allegation is insufficient and cannot withstand a motion to dismiss.

Thus, overall, Bailor has failed to state a claim alleging facts which would fall outside the scope of the discretionary function exception. Accordingly, Count IV of the amended complaint must be dismissed. *Gaubert*, 499 U.S. at 323–26, 111 S.Ct. at 1274–75.

### 3. The allegation of Respondeat Superior Liability

Count V of Bailor's First Amended Complaint alleges that the United States is vicariously liable for the negligence of the Salvation Army. Bailor claims that at all relevant times the Salvation Army was acting as an agent of the BOP, thereby subjecting the United States to liability pursuant to a *respondeat superior* theory. The United States argues that it cannot be held liable for the acts of the Salvation Army because that entity was not a BOP agent, but only an independent contractor.

The FTCA permits the United States to be sued for injuries resulting from the negligent acts committed by "any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). An " '[e]mployee of the government' includes officers or employees of any federal agency, .... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States," but expressly excludes liability for the acts of "any contractor with the government." 28 U.S.C. § 2671.

 The statute offers no definition of independent contractor, but the Supreme Court offers the general guidance that the court should consider "the common-law dis-

tinction between the liability of an employer for the negligent acts of his own employees and his liability for the employees of a party with whom he contracts for a specified performance." *Logue v. United States*, 412 U.S. 521, 526–27, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973). The "distinction between the servant or agent relationship and that of independent contractor turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Id.* at 527, 93 S.Ct. at 2219. This inquiry thus focuses on whether the governmental agency controls the detailed, physical performance of the contractor's day-to-day activities. *United States v. Orleans*, 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976); *Logue*, 412 U.S. at 527–528, 93 S.Ct. at 2219–20; *Cannon v. United States*, 645 F.2d 1128, 1134–35 (D.C.Cir.1981).[21]

Bailor asserts that the day-to-day operations of the Salvation Army Facility were controlled by the BOP. According to Bailor, the rigid guidelines set out by the Program Statements and SOW afforded the Salvation Army no opportunity to choose the means by which it implemented its contract.[22] Instead, Bailor argues:

> Point by point directives are given in the Statement of Work for food preparation, sanitation, collection of urine samples, sign out information, hiring of personnel, accounting methods, and record maintenance in addition to other aspects of life. Even minor sanctions used by the [Salvation Army Facility] had to be approved by the [BOP].

(Plaintiff's bf. in oppos. to U.S. motion to dismiss, p. 14).

Bailor correctly points out that the SOW established comprehensive guidelines for the performance of the contract. In fact, it sets out rather detailed requirements for administration, personnel, facility safety, sanitation,

---

**21.** Bailor argued in her opposing brief that the five factor analysis used in the case of *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132, 1136 governs this issue. However, *Logue* and *Orleans* were held not to be dispositive in *Mendrala* because they concerned the independent contractor exception, an issue not present in *Mendrala*. *Mendrala*, 955 F.2d at 1137. So, as the Govern-

ment correctly points out, the *Mendrala* analysis has no applicability here.

**22.** As noted in footnote 15, *supra*, references to the SOW will refer to the June 1987 version unless otherwise noted.

environmental health, rehabilitation programs (including discipline, drug aftercare, employment and many others), food services, medical services, records and reports, and release preparation. But, the question is not whether the Salvation Army "must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Orleans,* 425 U.S. at 815, 96 S.Ct. at 1976. For example, in *Orleans,* the

"community action agencies receiv[ing] federal funding, [had to] comply with extensive regulations which include[d] employment policies and procedures, lobbying limitations, accounting and inspection procedures, expenditure limitations, and programmatic limitations and application procedures ... [and] also numerous guidelines attempt[ing] to assure that the federal money [was] spent for the benefit of the poor."

425 U.S. at 817–18, 96 S.Ct. at 1977. Nevertheless, the regulations did not give the federal government "power to supervise the daily operation of the community action agency." *Id.*

Similarly, in *Logue,* a county jail housing federal prisoners pursuant to a contract with the BOP was held to be an independent contractor. 412 U.S. 521, 521, 93 S.Ct. 2215, 2216. The Court, observed that the county undertook

to provide custody in accordance with the Bureau of Prisons' 'rules and regulations governing the care and custody of persons committed' under the contract. These rules in turn specify standards of treatment for federal prisoners, including methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical services, and employment. But the agreement gives the United States no authority to physically supervise the conduct of the jail's employees.

*Id.* at 529–30, 93 S.Ct. at 2220. A careful examination of the SOW shows a division of responsibility between the BOP and the Salvation Army similar to the one between the BOP and the County Jail in *Logue.*

Looking to the areas underscored by Bailor it is clear that the SOW sets out rather comprehensive guidelines, yet still affords the Salvation Army great latitude on selecting the means of implementation. For example, the SOW directs the contractor to provide food service either by "contractor preparation and serving in the facility; resident preparation of food provided by the contractor; or through contractual arrangements with a local restaurant." (SOW, p. 17). It also sets out regulations governing the nutritional value of the food, and it directs that the menu shall be approved by a dietician. *Id.* The center must make provisions for residents who work during meal time, and food preparation must be done in compliance with applicable federal, state and/or local health laws and regulations. *Id.* The contractor, however, has complete discretion to choose which food service method is most appropriate for its facility; what the meal schedule and menu will be; and how Salvation Army staff shall operate the food service facility. So, by way of example, the Salvation Army is left to determine how it can best comply with its obligation to provide food service for the residents.

Another example referred to by Bailor is the hiring of personnel. Once again, while the SOW sets out extensive guidelines regarding personnel, the Salvation Army still maintains control over every day personnel decisions.

On the issue of staffing, the SOW provides that "[t]he Contractor shall have trained, paid staff, dressed and awake on the premises to provided twenty-four coverage, seven days a week." (SOW, p. 5). The number of staff must essentially comply with the staff/resident ratio in the Contractor's original proposal or as agreed to during negotiations. *Id.* Where the contractor seeks to reduce staff size, because of a reduction in the resident population, the BOP retains approval authority in order to assure adequate facility supervision. *Id.*

With regard to the hiring, firing and discipline of Salvation Army employees, the BOP has only minor input. *Id.* They reserve the right to reject employment of applicants with a criminal history, and they can prohibit employment of individuals who are under

supervised release, on parole, or on probation. With regard to key personnel (facility manager, assistant facility manager, and case manager/counselor(s)) the contractor must identify in its proposal the qualifications for these positions and any proposed changes must be submitted to the BOP. *Id.* Beyond these minimum standards of employment, the hiring decisions are entirely within the discretion of the contractor.

The SOW also sets out a limited code of conduct for employees, essentially prohibiting favoritism, gift giving, or personal relationships between the staff and residents. *Id.* at 6. In the event that an employee of the contractor violates the code of conduct it must be reported to the BOP. *Id.* At that time, the BOP will then determine whether the employee will be permitted to work with BOP's inmates.[23] However, the BOP has no authority to independently discipline Salvation Army employees, and it looks to the independent contractor to fulfill that task. *Id.* If the BOP finds the disciplinary action taken is not appropriate, its sole remedy would be to terminate the contract. *Id.*

Several aspects of personnel management are left entirely within the discretion of the Salvation Army. For example, employee work schedules, salaries, benefits, vacations, promotions and raises are solely within the discretion of the contractor. The code of conduct in the SOW speaks only to the very limited issue of employee-resident relationships and makes no reference to such common disciplinary issues as absenteeism, tardiness, sub-standard work performance, or poor attitude. The Salvation Army has wide discretion to establish its own policies and procedures on these matters, all beyond the scope of review by the BOP.

■ A review of the remaining portions of the SOW demonstrates similar results. That is, the BOP has established specific

conditions for implementing the government's objective of providing each inmate with a "reasonable opportunity to adjust to and prepare for his re-entry into the community." 18 U.S.C. § 3624. The provisions of the SOW evidence an intent to offer "aid, advice and oversight" to assure "the safety of residents" (who, after all, are still in the custody of the Attorney General) so that the overall integrity of the federal program can be maintained. *Orleans,* 425 U.S. at 818, 96 S.Ct. at 1977–78. However, "the regulations do not convert the acts of the [contractor] ... into federal government acts." *Orleans,* 425 U.S. at 816, 96 S.Ct. at 1976–77. Thus, the Salvation Army was clearly an independent contractor, and therefore under 28 U.S.C. § 2671 the United States is immune from liability for any negligent acts allegedly committed by them.[24] Accordingly, Count V of the amended complaint must also be dismissed.[25]

### *4. Improper Venue*

The United States has moved to dismiss this case for improper venue. Having already dismissed the case for lack of subject matter jurisdiction, it is unnecessary to address this argument.

### V. CONCLUSION

For the reasons stated above

1) The Defendants', Prison Fellowship Ministries' and Ken Jackson's Motion for Summary Judgment is GRANTED.

2) The Defendant's, the Salvation Army's Motion is GRANTED.

3) Defendant's, United States of America's Motion to Dismiss is GRANTED.

The Clerk is directed to enter judgment in favor of all Defendants accordingly.

**23.** However, the Salvation Army may take in residents from the state penal system. So, even where an employee is barred from working with residents in the custody of the federal government, he or she could still be retained to work exclusively with residents from the state system.

**24.** Of course, even if the Court found the Salvation Army was an agent of the BOP, dismissal

would be proper given that the Court has held that the Salvation Army owed no duty of care to Bailor. *See* Pt. IV, B of this memorandum of decision and order, *supra.*

**25.** Dismissal of Bailor's claims against the United States means that Darryl Bailor's loss of consortium claim must also be dismissed. *Nelson,* 598 N.E.2d 558.